1  UNITED STATES DISTRICT COURT
   WESTERN DISTRICT OF MISSOURI
2           WESTERN DIVISION

3
UNITED STATES OF AMERICA,
4
                 Plaintiff,      No. 18-00293-CRW-DGK
5
   v.                            Kansas City, Missouri
6                                September 17, 2019
TREVOR SCOTT SPARKS,             CRIMINAL
7
                 Defendant.
8

9
                ........................
10
        TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
11        BEFORE THE HONORABLE JOHN T. MAUGHMER
         UNITED STATES MAGISTRATE COURT JUDGE
12
        Proceedings recorded by electronic stenography
13          Transcript produced by computer

14 APPEARANCES:

15  For the Plaintiff:      MR. BRUCE RHOADES
                            United States Attorney's Office
16                          400 East 9th Street
                            Suite 5510
17                          Kansas City, Missouri 64106

18
    For the Defendant:      MR. JOSEPH W. VANOVER
19                          Vanover Law, L.L.C.
                            9800 N.W.  Polo Drive
20                          Suite 100
                            Kansas City, Missouri 64153
21

22  _____
               Judy K. Moore, CRR, RPR
23           United States Court Reporter
            400 East Ninth Street, #8420
24           Kansas City, Missouri 64106
                  816.512.5622
25

1    (Proceedings commenced at 2:31 p.m.)

           THE COURT:  Calling this afternoon criminal action
2    18-00293-CRW-DGK, United States of America versus Trevor Scott

3    Sparks.  May I first please have the entry of appearance of

4    counsel for the United States.

5           MR. RHOADES:  Bruce Rhoades for the United States,

6    your Honor.

7           THE COURT:  Thank you, Mr. Rhoades.

8           Counsel for Mr. Sparks?

9           MR. VANOVER:  Joe Vanover for Trevor Sparks who

10   appears in custody.

11          THE COURT:  Thank you.  Calling this action this

12   afternoon to take up defendant's motion for discovery

13   sanctions.  I thought it would be appropriate to have a hearing

14   on this matter.  I don't normally see motions of this nature,

15   and I thought perhaps it might benefit all of us if we could

16   perhaps clear the air on where we stand on discovery in this

17   case.

18          So, Mr. Vanover, it's your motion.  Let me ask you,

19   what do you want to tell me?

20          MR. VANOVER:  Discovery, I think it's fair to say,

21   is enormous in this case.  It looks like about over 20,000

22   pages of documents.  The total number of pages of documents is

23   in the neighborhood of 85,000, but I think approximately 65,000

24   of those pages of documents is one file that looks to be a copy

25   of an Excel Spreadsheet.  So to be fair, I think it's about

1  20,000 pages of documents.  My count was 193 recordings that

2  have been disclosed.

3          The main problem that the defense has is it's

4  unorganized.  It's a discovery dump.  It looks like they

5  collected everything and they just put it all together.  It's

6  not organized by date, which would be, it seems to me, the

7  logical way from the start of the investigation, month by month

8  as the investigation goes on, that it's all put together and

9  organized.

10          There's also duplicates throughout.  When I first

11  started noting the duplicates, I started to keep a log of it to

12  see when a report was -- when I saw a report twice, I would

13  make a note of what page it was in the discovery, but after a

14  while, it just got to be too much of a burden to continue to

15  create the log of all the duplicates in the discovery, so I

16  noted two duplicates in the motion.  But it's reading thousands

17  of pages.  It's difficult to tell which ones I've seen before

18  and which ones I haven't seen before.  But I do note many times

19  there are duplicates in there, where I've seen something before

20  and I've -- I can't figure out a reason why it would be in

21  there more than once.

22          There are some draft copies, it looks like police

23  reports, like KCPD will prepare a draft report of it, and then

24  my understanding of the procedure is it goes up to a sergeant

25  or some supervisor, then it gets finalized and then that's the

1   final report.  But there are some draft reports, and, again,

2   the amount of time it would take to go through and find each of

3   the draft reports and to compare them to the final reports to

4   see what's different, what's changed, and bring that to the

5   Court's attention, it would just take a tremendous amount of

6   work, so I just note today that there are drafts.

7           The lateness of some of the discovery is a very

8   significant issue.  The case was indicted December 12th last

9   year.  The initial round of discovery was disclosed

10  February 14th.  And, Judge, I've prepared some exhibits to

11  proffer to the Court that show certain dates.  I would like to

12  proffer to the Court the email that first notified defense

13  counsel that discovery was available, the first batch, on

14  February 14th.  So I would offer Exhibit 1.

15          THE COURT:  Any objection, Mr. Rhoades?

16          MR. RHOADES:  This appears to be an email from the

17  U.S. Attorney's Office, Judge.

18          MR. VANOVER:  And then Exhibit 2, July 8th is the

19  second batch of discovery, so I'd offer Exhibit 2.

20          MR. RHOADES:  This also appears to be an email from

21  the U.S. Attorney's Office, your Honor.

22          MR. VANOVER:  And then the third batch from the

23  discovery coordinator, who's Julie Finley in the U.S.

24  Attorney's Office, came by email on August 29th.  I would offer

25  Exhibit 3.

1          MR. RHOADES:  That's the same email, Judge.

2          MR. VANOVER:  So I would offer those three emails of

3  the three dates that discovery was made available to defense

4  from the discovery coordinator.

5          THE COURT:  Thank you.

6          MR. VANOVER:  In addition to that, there was an

7  email not from the discovery coordinator but from another

8  member of the office.  I'm not familiar with this person, but

9  it appears to be from Bailey Rush.  And that's an email dated

10  July 29th, and that notifies defense counsel that there is a

11  pole camera.  So I would offer Exhibit 4, which is the notice

12  about the pole camera on July 29.

13          MR. RHOADES:  That is also an email from the U.S.

14  Attorney's Office, your Honor.

15          THE COURT:  Any objection to any of those, Mr.

16  Rhoades?

17          MR. RHOADES:  I'm not sure what the purpose is.  As

18  far as acknowledging that they appear to be accurate copies of

19  emails that were sent by the U.S. Attorney's Office, I don't

20  dispute that, Judge.

21          THE COURT:  Very well.

22          MR. VANOVER:  The purpose, Judge, is, the largest

23  amount of discovery came in February, then there was some more

24  in July.  Then the deadline on the latest scheduling

25  conference -- or latest scheduling order for pre-trial motions

1  was in July, and I filed multiple motions, including a motion

2  to suppress, on the deadline to file pre-trial motions.  And

3  then it was just after that, July 29th, is when the notice came

4  out that there's a pole camera that apparently was pointed

5  towards the residence on Smart where a large amount of evidence

6  was seized and collected, and it's potentially important to the

7  motion to suppress.  So I filed my motion to suppress, and then

8  for the first time I heard that there was a pole camera that

9  was pointed towards the residence that I'm trying to suppress

10  the evidence.  So that has to do with the lateness of the

11  discovery.

12          Also, in the Government's reply to the motion to

13  suppress, the response of the Government to the motion to

14  suppress, the Government referred to extra new items of

15  discovery, at least reports and parts of the investigation that

16  I wasn't familiar with.  Because of the voluminous size of the

17  discovery, I thought it was possible that maybe I just missed

18  these new things that the Government refers to in their

19  response, and I requested the Government to let me know, was

20  this -- were these new items or was it stuff that I just missed

21  in reviewing the thousands of pages?  And if it was something

22  that I missed, could you please point out the Bates numbers in

23  the 20-some thousand pages of where these new items were?  And

24  I requested that from the Government, and they declined to

25  acknowledge if it was new or not.

1      THE COURT:  Specifically, what documents?

2      MR. VANOVER:  Online search -- well, I would offer

3  into evidence Exhibit 6, which is the email that discusses

4  this, and it lays out eight items.  And it's an email from

5  myself to counsel for the Government on August 20th and then

6  his reply later that night.  I would offer Exhibit 6 which

7  shows the list.

8      THE COURT:  Any objection to that, Mr. Rhoades?

9      MR. RHOADES:  Again, Judge, number one is, the -- it

10  appears to me that we are now entering into evidence

11  communication between the parties that I don't think that's

12  appropriate to do, but I don't dispute the fact that the

13  documents he has in his hand are, in fact, accurate replicas of

14  emails he sent to me and that I responded to.

15      THE COURT:  All right.  I think they're relevant at

16  least to the motion at hand, so to the extent that was an

17  objection, I'll overrule it.

18      MR. VANOVER:  Thank you, Judge.  The general nature

19  of the items, the property records search for the Walrond

20  residence; conversations between the FBI agent, who's

21  McCormick, and a Probation Officer Estes; a water bill for the

22  Walrond residence; spot checks of the Walrond residence;

23  multiple reports where Mr. Sparks apparently resides at the

24  Smart residence; KCPD reports from a robbery at the Smart

25  residence in 2018; observations of a Dodge truck at the Smart

1  residence; and then reports the pole camera.  So those are

2  items that I requested, basically, is this new or did I just

3  miss this, and if I missed this, could you please just point

4  out where they are so I don't have to claim that you've

5  disclosed a bunch of new stuff.

6          As to the pole camera itself, when I was first

7  notified about the pole camera, I requested, I want to review

8  the pole camera images and all summaries of what is shown.  In

9  my experience with law enforcement, they investigate, they take

10  notes, they write reports.  And even if they don't write a full

11  report, they still take notes when they have evidence of what

12  it is, especially a pole camera that's pointed towards the

13  target of a -- what appears to be a significant investigation.

14  It's just -- it seems too farfetched that law enforcement would

15  have a pole camera and not take notes of what's shown on it.

16          So I asked for the summaries, and the agent,

17  Ms. McCormick, said there are no official written summaries at

18  this time.  So I requested the unofficial summaries, and I got

19  no reply as far as were there official summaries or unofficial

20  summaries.  Basically, counsel for the government repeatedly

21  said I -- the contents are available for review but would not

22  confirm or deny that there were summaries of what's shown on

23  the pole camera.  So that's an issue that even --

24          I think in the response of the Government, they --

25  the Government says he tried to notify me that there were no

1    summaries, but prior to filing of that document, I was just,

2    one, trying to find out, are there summaries of the pole

3    camera.  Because it just seems so farfetched that there would

4    be a pole camera pointed towards the residence and there's no

5    notes.  So I would offer into evidence Exhibit 5 regarding

6    whether or not there are summaries of the pole camera.

7              THE COURT:  Any objection, Mr. Rhoades?

8              MR. RHOADES:  Just one moment, your Honor.  I have

9    the same comment I had on the others, Judge.

10             THE COURT:  Very well.  5 admitted.

11             MR. VANOVER:  I think the final point on the pole

12   camera is the scheduling orders that the Court entered

13   repeatedly.  I think they all said the Government's obligated

14   to turn over electronic surveillance or notes, logs, reports of

15   electronic surveillance.  I think that's just a standard part

16   of the scheduling order.  And so that would be -- my argument

17   is, notes from what's on the pole camera is a log of electronic

18   surveillance, because the camera itself is an electronic device

19   that shoots towards a certain direction, and if there are notes

20   of that, that that's discoverable now -- or, actually, before,

21   it should have been already, but I would point out to the

22   Court, it looks like the Government 's position, at least as

23   shown in Footnote 1 of the Government's response regarding

24   discovery sanctions, it appears the Government's position is

25   that the summaries of what's on the pole camera will be

produced at least 14 days prior to such testimony because it's

Jencks Act material, which is very different than the

scheduling order.  The scheduling order says they're required

to turn over electronic surveillance and logs or notes

regarding the electronic surveillance now, but it looks like

the Government has made the decision to, if there are -- if

there ever are created notes from the pole camera, that they're

going to wait until two weeks prior to testimony about it to

disclose it.

So, Judge, the -- oh.  A new thing that's come up

since the pleadings have been filed, the Government disclosed,

I think it was in the last batch of discovery that the

Government disclosed, they produced some photographs, and it

looks like photographs that were taken just prior to the

execution of the arrest warrants on December 18th, but because

the photographs are produced in a PDF format, there's no

metadata with the photographs.  Normally a digital photograph

has metadata which shows when the picture was taken according

to the camera's date and also shows other items, you know, what

kind of camera it was.  But the main point of it would be the

newest batch of discovery includes photographs, and it's

helpful -- it would be helpful to the defense to know when

those photographs were taken.  Now, I have not asked for that

yet.  I did not file a supplemental motion because it's an

important point, but it's a much smaller point than the big

1   point of thousands of pages of discovery that are -- they're

2   just not organized.  It's a mess.  It's like a rat's nest.  And

3   it's huge.

4           And then the lateness, new stuff is coming out after

5   I filed a motion to suppress.  Those are the two main things,

6   and that's why the defense is asking that the Court exclude

7   newly disclosed information.  Basically, I'm suggesting the

8   cutoff point of when the defense filed its motion to suppress.

9   Anything that's disclosed after that or referenced to, reports

10  that were not disclosed prior to that, should be excluded,

11  should not be considered either in the suppression hearing,

12  which is for tomorrow, or at trial in the event of a trial.  So

13  that's pretty much all I have to say argument-wise.

14          THE COURT:  Let me ask you, Mr. Vanover,

15  notwithstanding the relief that you asked for in your motion,

16  with respect to the motion to suppress, are you otherwise ready

17  to proceed tomorrow on behalf of Mr. Sparks?

18          MR. VANOVER:  The defense will be.  I have a little

19  bit of work to do, you know, tonight and in the morning, but

20  basically, yes.

21          THE COURT:  All right.

22          MR. VANOVER:  I'm working towards a suppression

23  hearing tomorrow at 1:00.

24          THE COURT:  Okay.

25          MR. VANOVER:  Two other things I forgot to mention.

1  Just to show the Court, I have screen shots of the discovery

2  that was produced.  It's somewhat helpful.  Exhibit Number 7

3  shows a large number of the recordings, and then it has the

4  page numbers.  For instance, they all go by the first

5  defendant's name, which is Ginnings, so they're referred to as

6  GINN_0001 through 00123.  And that goes all the way up to

7  84,718.  So that's Exhibit 7 I would offer to show you kind of

8  the file structure that they've been produced in.  It doesn't

9  completely show the nature of the rat's nest, but it somewhat

10  shows it.  I would offer that.

11          MR. RHOADES:  I don't dispute that that's a document

12  from the U.S. Attorney's Office, your Honor.

13          THE COURT:  Very well.

14          MR. VANOVER:  And then Number 8 is the most recent

15  discovery that's been produced.  It's not been on a hard drive.

16  The initial batch was so big it had to come on a separate hard

17  drive.  The extra batches are on a separate sheet.  But I have

18  basically the same thing, it's a screen shot that shows a new

19  recording and then more page numbers.  And that's Exhibit 8.  I

20  would offer 8.

21          MR. RHOADES:  Same thing, Judge.

22          THE COURT:  Very well.

23          MR. VANOVER:  I wish I could fully describe the

24  nature of the discovery, but it would -- I don't -- it's just

25  so enormous and confused.  It's not completely like they tore

1  the cover off a book and mixed up the pages, it's not that,

2  Judge, but it looks like they tore the cover off a book and

3  mixed up the chapters and the chapters aren't in order.  So

4  there are police reports from one incident and then -- you

5  know, that happened months before, and then there are later

6  incidents that are months after, and it goes back and forth.

7  So it's not a straight randomization of that by any means, but

8  it does look like -- the reports themselves are just

9  unorganized and they're just kind of, give me everything you

10  have, let's put it on there and scan it in and send it out.

11          THE COURT:  All right.  Thank you, Mr. Vanover.  Mr.

12  Rhoades, response for the Government?

13          MR. RHOADES:  Your Honor, frankly, if I had my

14  druthers, I'd respond to Mr. Vanover's attacks about rat's

15  nest, but I don't think it would produce anything.  I, frankly,

16  think that he wouldn't know a discovery of a large

17  multi-defendant case if it hit him in the head.  He's never had

18  one.  The fact that he bases all this on his experience and the

19  way things should be is ridiculous when he doesn't know the

20  first thing about prosecuting a multi-defendant case or the

21  first thing about defending a multi-defendant case.

22          The discovery, your Honor, we responded to his inane

23  motion and attempted to inform the Court of each and every

24  response.  I find it fascinating that he dropped his two major

25  issues about *Brady* and *Gigleo* when it was pointed out to him

14

how stupid those arguments were.  And so, therefore, he now is
raising issues about a rat's nest and a cover ripped off a
book, which is just ludicrous and ridiculous.  And so I'm in a
situation, Judge, where I think the best thing to do, although
I don't think it's fair to do it right now, but I'm happy to do
it if that's what the Court wants to do, is to put the case
agent on and to put on the discovery coordinator who will shred
Mr. Vanover's complete ludicrous description of the discovery.
There are 14 other -- I'm sorry -- 13 other defendants in this
case.  Not a single one of them have raised one single issue
about any kind of problem with the discovery.  And what really
is the problem is, first of all, there's too much discovery,
then it's too late, but by his own admission, the vast majority
of the discovery was disseminated in February, less than three
months after indictment.

         I do not dispute, Judge, that we continue to
investigate the case and continue to disseminate discovery.
And we will continue to do that.  I don't say that as a
challenge to the Court.  I don't mean it that way at all.  What
I mean is that that's how you prosecute a case.  Even today,
Judge, we are conducting proffers today with co-defendants
which will produce additional discovery.  And we will continue
to do that.

         With respect to Mr. Vanover's comments about the
things that he was missing because of the fact that we didn't

1    provide them prior to him filing his motion to suppress, let me

2    just start with the really blatant one.  He's objecting to an

3    affidavit to search warrant, and one of the facts in the

4    affidavit is about the vehicle at that location.  And then he

5    has the gall to tell this Court and file a motion with this

6    Court that that information was not provided to him.  It's in

7    the affidavit that he's objecting to.

8              The surveillance information, your Honor, there

9    is -- there was provided during discovery surveillance of the

10   Smart residence on December the 10th of 2018 and December the

11   18th of 2018, prior to execution of the arrest warrant.  That

12   was -- that surveillance information was provided in initial

13   discovery.  The latest round of discovery, which was sent out

14   on...  I believe the email that he introduced was the 29th of

15   August, and it was picked up by Mr. Vanover on the 3rd of

16   September, if my memory serves me, Judge.  I'll admit right

17   now -- anyway, that discovery included pre-arrest surveillance

18   photos of the Walrond and Smart residences and other planned

19   arrest locations.  It also included other information that is

20   included in the email that Mr. Vanover sent me, and as I

21   indicated to him, as much as it aggravates me for people to

22   think that they should introduce emails between the parties,

23   but I've become so used to it with certain defense lawyers that

24   I am very careful about what I write in emails now, that it was

25   very clear that those things were not discovery until he raised

1    them.  I had no idea that where his wife lives, that he was

2    going to claim we didn't have any information that he lived

3    there and we had no right to execute that arrest warrant there.

4    And I certainly didn't believe that, based on the plethora of

5    information in the discovery of the activities of this

6    defendant at the Smart residence, that he would have the

7    unmitigated gall to allege that we had no information to give

8    us a right to execute an arrest warrant at the Smart residence.

9         So when he raised that, besides the surveillance

10   that was already in the discovery, we then went back and

11   produced for him all of the discovery that we -- all of the

12   activities that we did to determine those two locations were

13   valid places to execute the arrest warrants.  I'm not going to

14   try the suppression hearing today because it's set for

15   tomorrow, but those items were absolutely produced after he had

16   filed his motion to suppress because we had no idea that those

17   things were relevant to anything.

18        With respect to the pole camera, holy crap, I don't

19   know what else to say, Judge.  I can't say it any clearer.

20   There are no summaries of the pole camera.  I don't know what

21   Mr. Vanover's experience is.  I've gotta believe it's probably

22   zero with respect to pole cameras.  But there was a pole camera

23   put up unbeknownst by us, not at our request, from August to

24   December of 2018.  We didn't know about it until shortly before

25   we arrested Mr. Sparks at the Smart residence.  And when we

1  found out about it --

2  THE COURT: What date was that?

3  MR. RHOADES: The arrest?

4  THE COURT: Yes.

5  MR. RHOADES: It was the 18th of December. That's

6  when we found -- now, we found out about the pole camera before

7  that, Judge. I don't know the exact date, but it was shortly

8  before that. It was shortly before that. It could have been

9  two weeks before that, it could have been three weeks. I don't

10  know the exact date. I can get the exact date for the Court

11  when we found out about the pole camera.

12  THE COURT: That's all right. And I understand your

13  statement about there just aren't any summaries, I get that,

14  but why, if you learned about the pole camera in December of

15  2018, why wasn't the footage produced until July of '19?

16  MR. RHOADES: We were trying to go through it,

17  Judge. It's four months' worth of discover -- of pole camera

18  24/7. I don't know what that math works out to. We were

19  trying to go through it because the goal was to go through it

20  and figure out what was on it before we disseminate it. That's

21  what we were trying to do. We have yet to go through the

22  entire pole camera. It is that extensive. We recognize it's

23  extensive. So once we realized -- let me rephrase that. Once

24  I realized that the time frame for getting through that was

25  getting away from us, that's when we notified all of the

defense lawyers that if they wanted to come look at it, they

were available to look at it.  We had not reviewed it ourselves

yet.  We had started that review but hadn't finished it.  But

there's no summaries of it.  There's no preliminary reports.

There's no anything reports.  There's nothing.

The part about the footnote -- by the way, speaking

of the footnote, I never declined to provide anything.  I just

didn't respond.  Now, maybe that's a distinction without a

difference or a difference without a distinction, I don't know,

but I certainly didn't decline.  Also, the footnote speaks for

itself.  And I don't -- Mr. Vanover's inability to summarize a

footnote on a written page -- the footnote speaks for itself.

I'm sure the Court's already read it.  The point is this,

Judge:  We absolutely hope at some point to get through that

and have some idea if there's anything on there that we find to

be either inculpatory, exculpatory, or anything else that needs

to be noted.  But, frankly, Judge, until that happens, we don't

have anything to provide.

Now, I will actually agree with Mr. Vanover, I would

prefer to have that.  You know why?  Because then I wouldn't

have to go through the entire pole camera myself.  But as it

stands right now, I have not done that.  We are in the process.

We hope maybe this month to finish getting through it.  At that

point I will probably ask for some kind of summary from it,

because there does not exist a summary, there's no notes,

1     there's no nothing.  I'm going to ask, is there something on

2     there that we think is of significance?  Right now the only

3     thing we know of significance on there is what we put in our

4     suppression response, which was related to the robbery that

5     occurred that was reported by Hack and Walker and that, while

6     being investigated, Sparks rolled up there and also is in the

7     reports.  The rest of what's in there is just -- it's a pole

8     camera.

9            I don't know, Judge -- and no disrespect, sir.  I

10    don't know if you've ever watched a pole camera.  Not good

11    viewing.  But it's gotta be gone through.  It's four months'

12    worth.  It's 24 -- it runs 24 hours a day.  So we're -- at one

13    point we had a light-duty detective trying to go through it.

14    It took so long that he's now back on full-duty.  So we are

15    hoping to finish it this month.

16            But be that as it may, we made the notification in

17    July, as the emails that were introduced by the defense

18    indicate, and that's when the notification was made.  And I've

19    explained why I did that notification when I did it.

20            Frankly, Judge, the Government's response to the

21    discovery motion, we think, addresses everything, and so that's

22    what we're standing on, unless the Court has questions of me.

23            THE COURT:  What's our trial date in this case?

24            MR. RHOADES:  The trial date is currently set in

25    October.  I know for a -- I know that there is a concerted

1 effort by a large number of the defense lawyers to move that

2 case many months forward, simply because of the fact that there

3 is so much discovery that they have not been able to get into

4 and the fact that there have been late -- defendants have come

5 in late. We've had to change lawyers at least on one

6 defendant, and so -- at least I think that's this case. I may

7 be wrong. But anyway, So that's what I understand is

8 happening. Obviously, that's up to the Court whether the Court

9 grants that or not.

10 THE COURT: Anything further, Mr. Rhoades?

11 MR. RHOADES: Not from me, Judge, unless there's a

12 question from the Court.

13 THE COURT: Let me take a moment. We'll be in

14 recess.

15 (Brief recess.)

16 MR. RHOADES: Judge, I was talking to Detective

17 Horalek. The pole camera was discovered on November the 24th.

18 I don't know that this matters, but I just... There was a

19 murder investigation that prompted putting the pole camera up

20 in August, and then the -- there was a robbery. The robbery I

21 mentioned happened on the 23rd, and then in response to that,

22 we found out about the pole camera on the 24th.

23 THE COURT: Before we go any further, Mr. Vanover,

24 any response you want to make, sir?

25 MR. VANOVER: Yes, Judge. Mr. Rhoades points out

1   that no other defendant has made the same complaints that I

2   have.  Well, I don't know which ones are cooperating, but I

3   would -- I think it's safe to assume any cooperating defendant

4   is not going to complain about the discovery because they're

5   working towards an agreement with the Government.  And Mr.

6   Rhoades said -- I think he said even today they're doing

7   proffers from co-defendants, so I think some of those

8   co-defendants who haven't complained, it sounds like they are

9   not complaining because they're cooperating.

10          The issue about continuing to investigate, I

11  understand that continuing to investigate is one thing, but the

12  lateness of some of the disclosures is not new investigation;

13  it's turning over old stuff.  I mentioned some photos that were

14  in the last batch of discovery that came out.  Those were

15  photos that looks like they were taken before the arrest.  The

16  pole camera was definitely way before.  So this -- some of the

17  items that are complained about are not new investigation that

18  they've just now received; it's old stuff.

19          As far as Mr. Rhoades didn't know that some of these

20  things were discovery until the motion was filed, that just --

21  it doesn't make sense to me if there's a pole camera in front

22  of a house where they think drugs are being sold that that's

23  not discovery, but I guess if the Government takes the position

24  it's not discovery until they say it is, then maybe that's what

25  he's saying.

1    And then the references to the pole camera and the

2  goal was to go through it and they had started it, that there

3  was an off-duty -- or a light-duty detective that was going

4  through it but didn't get through, it sounds like some of the

5  review has already been done.  And I don't know how detectives

6  go through pole cameras, but if someone is reviewing evidence

7  to see if there's anything noteworthy, I would think that there

8  would be notes of the work that's been done so far that Mr.

9  Rhoades says, there's nothing to turn over, there's no notes,

10 there's no nothing.

11    So those are just my replies to some of the points

12 that he mentioned.

13    THE COURT:  All right.  Thank you, sir.

14    Gentlemen, let me address this issue in the best way

15 I know how, and that's to try to directly address some of these

16 arguments.

17    It strikes me that, to a significant degree, this

18 particular dispute is a symptom of what large scale drug

19 conspiracies that are charged by the Government can result in.

20 And by that what I mean is they're complex, they're

21 complicated.  Mr. Rhoades has indicated they do, in fact,

22 result in a huge volume of discovery.  As Mr. Vanover has

23 indicated, that becomes a very difficult task for defense

24 counsel to understand, grapple with, get their hands around.

25 And it's a hard -- it's a hard circumstance for both sides to

1    manage.

2         But I also believe the reality is the Government

3    chooses to indict cases of this nature that result in huge

4    volumes of discovery that are legitimately created.  The

5    Government has a responsibility to produce that discovery, to

6    produce it in a reasonable fashion, and to do, I believe, what

7    they can to help defense counsel through the difficult review

8    of that discovery.  That's not a responsibility that goes one

9    way.  It's a responsibility for defense counsel to also sit

10   down in a civil manner and try to address problems that arise,

11   and it's a responsibility of both the lawyers in the case to do

12   that in a cooperative manner.  And, historically, that's what's

13   been done in this District.  And, frankly, that's what not only

14   this Court but I think every judge on this Court expects.

15        Mr. Vanover, with respect to the volume of discovery

16   in this case, you know, I understand your concern about that,

17   and, frankly, there's nothing you can do about it and there's

18   nothing I can do about it, and there's not a whole lot that Mr.

19   Rhoades can do about it.  These types of cases simply in this

20   day and age of electronic investigation result in the type of

21   volume that you describe.  And I don't doubt that it's

22   difficult to handle, but it's a task that you and every other

23   criminal defense lawyer in the city face in terms of how to

24   deal with that.  There is, I think, a responsibility for the

25   Government to do its best to produce that discovery in a

1   reasonably organized fashion.

2          My belief, my expectation, is -- my understanding is
3   that there's a centralized discovery coordinator in the
4   Government's -- in the U.S. Attorney's Office whose
5   responsibility it is to do that.  So I think that's significant
6   for this reason:  I don't think there's any reason to believe
7   in this case that the discovery was produced in any kind of
8   manner than it is normally produced in every large drug
9   conspiracy case.

10         In terms of the timeliness, I think that's always a
11  problem and I think it's a problem that the Court in general,
12  not just in this case but the Court in general, believes the
13  Government's going to have to pay closer attention to in the
14  future in terms of when it marshals the discovery in its cases
15  and when that discovery is produced.  The Government controls
16  when an indictment is returned, when a charge is filed.  The
17  Government controls how the discovery and the evidence and the
18  investigation in the case is conducted, and with that control
19  comes responsibility, then, to disseminate that information in
20  a timely and a reasonable manner.

21         I thought probably the most difficult question for
22  me to deal with in this case was the timeliness of the
23  disclosure of the pole camera discovery.  Two issues in that
24  regard.  First of all, Mr. Vanover's argument that there ought
25  to be notes, summaries, logs, et cetera, in connection with

1  that camera, that's a reasonable argument.  Mr. Rhoades'

2  response is, that information does not exist in this case.  I

3  have to take that response as an officer of the Court at face

4  value, and if that's the fact, as Mr. Rhoades represents it is,

5  that is an adequate response to that inquiry.

6          With respect to the timeliness of the disclosure, I

7  thought, why in the world if the camera was discovered in

8  November of 2018 was it not produced until July of this year?

9  I think Mr. Rhoades' explanation with that is not an

10 unreasonable explanation.  If it's a camera that does run 24

11 hours a day, seven days a week, 365 days a year and it's been

12 in place for four months, it's not unreasonable for the

13 Government to choose to know what it shows before it discloses

14 the discovery.  So while I thought that was going to be -- that

15 does not turn out to be perhaps the issue that I thought it was

16 going to turn out to be.

17          Gentlemen, here's the bottom line in this case:

18 This is a difficult thing for you two to deal with, but I

19 expect you to deal with it in a better manner than has been

20 dealt with to date.  Specifically, Mr. Rhoades, I expect you to

21 work cooperatively with Mr. Vanover and, if he has questions,

22 to do your best to resolve them.  And, Mr. Vanover, I expect

23 you to work cooperatively with Mr. Rhoades in the same regard.

24 I'll be very, very candid with you, Mr. Rhoades.  You've

25 indicated a degree of frustration in your response today that

1  is not persuasive to the Court.  You know, factually you may

2  have had some things to say that are appropriate responses.

3  The manner in which they were delivered today was not helpful,

4  and that is the kind of cooperation that I do not expect to

5  see.  So I would ask you to take that comment to heart and

6  please think about that in the future.

7          Mr. Vanover, with respect to the particular remedy

8  that you request in this case, that any discovery produced

9  after the date of filing of the motion to suppress in this --

10  that you have filed in this case, is a remedy that I do not

11  think is warranted by the circumstances, and I do not intend to

12  grant that remedy.  To the extent that you have requested other

13  discovery sanctions in the case, I don't believe the record

14  before the Court warrants the imposition of discovery

15  sanctions, but that's not to say that I don't expect better

16  from both of you in this case in terms of how it is to be

17  litigated.

18          With that, I'll deny the motion for imposition of

19  sanctions.  Having said that, let me ask you, Mr. Rhoades, what

20  is your current understanding of where the discovery production

21  is in this case, not only with respect to Mr. Sparks but with

22  respect to any of the defendants in the case?

23          MR. RHOADES:  Judge, I apologize.  I'm having a

24  little bit of trouble hearing you.  I heard that, but I wanted

25  you to understand why I was cocking my head, because I was

1  having a little bit of trouble hearing you.

2        THE COURT:  Fair enough.

3        MR. RHOADES:  Judge, we disseminate -- 99 percent of

4  the time we disseminate discovery to everybody, because we

5  found that even if it only addresses one defendant, it

6  sometimes gets us in trouble when we make the decision about,

7  well, we think this only deals with you.  So we pretty much --

8  not always, obviously, but we pretty much push out everything

9  to everybody.  So currently we have everything out.

10        THE COURT:  And that's what I'm asking.

11        MR. RHOADES:  Currently, we have everything out,

12  Judge.  What I will tell you is there are proffer reports

13  that were -- that there were proffers completed prior to today.

14  I talked about we were doing some today, but even prior to

15  today, those reports have not been either prepared or have not

16  been disseminated yet.

17        Proffer reports are a little bit different, as the

18  Court, I'm sure, knows, depending on who produces that

19  report -- sorry, I misspoke -- depending on who that report is

20  from, meaning the person that provided the information,

21  sometimes we choose to hold that information for a period of

22  time.  Sometimes we choose to produce that information in a

23  redacted format.  Sometimes we choose to produce that

24  information via people coming in and reviewing it.  That is not

25  done -- that is absolutely -- the holding of the information is

1  done not very often but sometimes for tactical purposes.

2         I'll give the Court an example. We have somebody

3  scheduled to come in and proffer in two weeks and somebody that

4  proffered today, provided information that we want to talk to

5  that person about. It does not behoove us to put out this

6  person's report before we talk to that person. That doesn't

7  happen a lot, just to be candid.

8         So as it stands today, to the best of my knowledge,

9  we believe that we have out all the discovery. There is, I

10 believe, some reports of proffers and some ongoing

11 investigation to follow up information we had gotten either

12 through proffers or other investigation that are still coming

13 in. And we disseminate those, Judge. We don't do it every

14 time we get one report, we just don't. We try to accumulate

15 stuff. But we also, the farther we get into a case, the sooner

16 we disseminate things. So early in a case we might hold things

17 and accumulate things for -- I'm making this number up -- 60

18 days and then disseminate it. But the farther we get into a

19 case, the less we assimilate stuff and we start producing stuff

20 more quickly, just because it needs to be out.

21        But to answer the Court's question -- and I

22 apologize, it went way beyond your initial question, but to

23 answer the Court's question is, as it stands today, everything

24 is out, as far as we know. And I don't use that as a copout,

25 Judge, but I want to be very clear that we can see openly -- as

1  I said in my response to the defense's motion, there absolutely

2  are things that defense lawyers bring to us and say, hey, I

3  don't see X.  And we look, and sometimes we'll say, well, "X"

4  is there, or we'll say, "X" is not there, we'll get it, either

5  because we didn't disseminate it initially because we didn't

6  think it was relevant or because we thought we disseminated it

7  and it didn't get out.  So we continued to do that, but by and

8  large, at this stage in this case, we're up-to-date.

9           THE COURT:  All right.  Thank you, sir.

10          Mr. Vanover, anything further for Mr. Sparks this

11 afternoon.

12          MR. VANOVER:  Not for this afternoon, Judge.

13          THE COURT:  Mr. Rhoades, for the United States?

14          MR. RHOADES:  No, your Honor.

15          THE COURT:  All right.  We'll be in recess.

16          (Proceedings concluded at 3:27 p.m.)

17                      CERTIFICATE

18      I certify that the foregoing is a correct transcript

19 from the record of proceedings in the above-entitled matter.

20

21 October 4, 2019

22

23

                /s/Judy K. Moore
24              JUDY K. MOORE, CRR, RPR
                United States Court Reporter
25